LAURIER BONEFANT, PRO AMI *vs.* FRANCOIS CHAPDELAINE

EDWARD BONEFANT *vs.* FRANCOIS CHAPDELAINE

CHESTER CARTER *vs.* FRANCOIS CHAPDELAINE.

Kennebec.　　Opinion, February 15, 1932.

*Arthur F. Tiffin,*
*Walter M. Sanborn,* for plaintiffs.
*Gower & Eames,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRINGTON, THAXTER, JJ.

FARRINGTON, J.   Three separate actions arising out of the same accident, the first brought by Laurier Bonefant, *pro ami*, to recover damages for personal injuries, the second brought by Edward Bonefant seeking recovery for expenses and loss of services of his minor son, Laurier Bonefant, and the third by Chester Carter to recover for personal injuries and property damage.

A verdict in favor of the plaintiff was returned in each one of the three actions, the sums named in said verdicts, in the order stated above, being $897.72, $750.10 and $6,037.50.

Each one of the three cases, which were tried together, is before this Court on general motion and on exception to a ruling of the Justice presiding.

Laurier Bonefant and Chester Carter on June 30, 1931, on a tandem seat motorcycle operated by Bonefant and owned by Carter, who was on the rear seat, were riding in a northerly direction on the highway in Augusta, Maine, known as Mt. Vernon Avenue, en route to North Augusta where they were going to see what arrangements could be made to exchange motorcycles for automobiles. There appears to be no question but that the motorcycle was on its right-hand side of the road up to and at the time of the accident.

Bonefant testified that he was familiar with a sharp bend in the road about four hundred feet easterly of the Brookside Garage near which the accident occurred; that he came around the bend at a speed of approximately thirty miles an hour; that directly after he got around the bend he saw a car coming towards him which proved to be the defendant's car, and that he was about the same distance from Brookside Garage as the defendant's car was, and that until the cars came together he kept it in sight. In describing the course

of this car, which was coming from the opposite direction, Bonefant testified on direct examination that "It took an angle course about in the middle of the road, and just a little beyond the house; and then swung back to his right-hand side again; and then after I got down a little ways, he cut in front of me," when Bonefant was ten or fifteen feet away from him. This was just beyond Brookside Garage on the side of the road on which the motorcycle was travelling. Asked to explain to the jury what he saw and did when he saw defendant coming onto his side of the road, Bonefant testified, "Well, he was up beyond the road there when I saw him coming that angle way, I didn't pay much attention to him because that was way up the road; then he swung over to his right again, and I thought he probably looked around or something. When we got down to the road he cut right in front of me; and he was so near to me I didn't have time to do anything so I took my hands off, and we hit. I swung off to my right as far as I could, and he hit me right in the ditch, beyond the driveway."

On re-direct examination Bonefant was asked how far away from defendant's car he was when he knew the automobile was going to cross onto his right-hand side of the road and he replied, "Well, when I really knew that the accident was going to happen, I was ten or fifteen feet away from him." The real test of whether or not he was in the exercise of due care did not depend on what he then *knew* was going to happen but rather upon what he as a reasonably prudent man might have regarded as likely to happen if the defendant continued to move in the direction of the garage, and it is important to bear in mind that Bonefant said he thought defendant was going in that direction.

On cross examination Bonefant said that he saw the defendant's car down beyond the Breton house, which was the house referred to by him in his direct examination, and that while defendant was there he saw him turn toward the center of the road and that he, Bonefant, kept coming toward him and that, as Bonefant approached, the defendant swung back on his right-hand side of the road. After some questions and after having his attention called to a statement made by him in a deposition, Bonefant testified that when the defendant started to angle across the road toward the garage the second time, he, the defendant, was about half way be-

tween the Breton house and the garage, about the same distance as Bonefant himself was from what is testified to as the blinker post, near which the accident occurred. At this point, in other words, Bonefant was about as far east of the Brookside Garage as the defendant was west of it.

When asked why he did not swing left of the defendant and go on the other side, Bonefant replied, "Because I didn't *know* he was turning in there." He said that he saw him angling across toward the garage but he did not think "he was going to turn *then* because he was too far from the garage driveway." At another point, when asked why he did not turn to the left, he said, ". . . I didn't think he was going to turn in there quick the way he was going," but he admits he thought he was going in that direction. When asked this question, "You thought it over and thought you had time to go on the right-hand side?" he answered, "Yes, sir." And asked this question, "You thought you would take a chance and go on the right-hand side?" he answered, "Yes." And again, when asked, "You did have time to think about it at the time and decide to go on the right-hand side, on your right-hand side?" he replied, "Yes, sir."

And it is important to note that this was at a time when the defendant's car and the motorcycle were about one hundred thirty feet apart.

There is undisputed testimony that the motorcycle was equipped with front and rear brakes and that the brakes were in good condition. When asked this question, "When you saw him angling across the road the last time and you were back east of the Brookside Garage, was there any reason why you couldn't have stopped your motorcycle with your brakes if you had wanted to?" Bonefant answered, "Well, I didn't expect him to do that," but he testified that he could have stopped it.

One witness, who saw the motorcycle pass several automobiles at a point six-tenths of a mile easterly from the Brookside Garage, recognized the driver and testified the speed was fifty to fifty-five miles an hour. Another witness, at a point three-fourths of a mile from the scene of the accident, recognized Bonefant driving the motorcycle, and when asked if the speed attracted his attention, replied that he "calculated they were going fast enough so they might get killed."

Regardless of what the actual rate of speed was at the points as to which the above testimony related, Bonefant testified that he did not know how fast he was going when he passed the automobiles but he also testified that he did not slow down any as he approached the bend next east of Brookside Garage and that he did not slow down any before he struck the defendant's car. The significance of this unqualified admission on the part of Bonefant can not be overlooked or ignored.

Flora Breton, a witness for the plaintiffs, requiring the services of an interpreter, was an eye witness of the accident. There is some conflict as to her testimony in regard to the speed of the motorcycle. She testified that the first she saw of the automobile it was on its side of the road, but, asked where it was when it turned into the middle of the road, she replied, "About the middle, between the garage and my house." She testified that it then went back on its side and then came out again about fifteen feet from the blinker post where the accident occurred. She heard no horn by defendant and saw him give no warning by hand or anything; she said he was moving from twenty to twenty-five miles an hour.

On cross examination Mrs. Breton said that she signed a statement that when defendant was about halfway between her house and garage she saw him start to drive "across the street to the garage," and this statement remained unchanged and unqualified.

The defendant, Francois Chapdelaine, testified that he had been gathering strawberries at the Willows, a place west of the Brookside Garage, and was on his way home when the accident happened, it being his intention to call for a battery at the garage and to drive on home from there. He said he was on his own side of the road and that he began to turn to go toward the driveway of the garage at a point a little above mail box No. 2, which was testified to by the surveyor as ninety-four feet distant from a point opposite the west blinker post near which the accident occurred. He testified that he drove in a straight line and that before he started he looked behind and looked ahead and saw nothing in either direction; that he put out his left hand, the only hand he had, steadying the wheel with his right arm. He said he heard the sound of a motor but did not know that a motorcycle was coming, and the first he saw it was when it hit him; that the motorcycle turned his

car "right around square and broke it." He said he was driving ten to fifteen miles an hour when he was hit.

Carter's testimony throws no light on the question of the legal responsibility of either the driver of the automobile or the motorcycle.

We find no difficulty in justifying the jury's verdict as far as it is based on the negligence of the defendant, but we reluctantly find ourselves unable to agree that the plaintiff, Laurier Bonefant, was free from negligence on his part. On a careful examination of the entire record we can not escape the conclusion that the reasonably prudent driver would not have kept on his course with unabated speed after it became apparent to him that there was a possibility of the automobile crossing to the garage. The record shows that the driver had time to consider this possibility but instead of stopping the motorcycle or slowing it down, to any degree, to make sure of the course of the automobile, which in our judgment, under the circumstances, was clearly the duty of a reasonably prudent man, he decided to "take a chance and go on the right-hand side."

We can see no emergency except as Bonefant created it and a self-created emergency avails nothing. It seems, unfortunately for all concerned, another case where a driver indulged in a false sense of security, unjustified by the mere fact that he was on his own side of the road. Drivers of automobiles must come to realize that, because they are on their right side of the road, they are not thereby absolved from the responsibility to use due care toward others who may themselves be on the wrong side. *Ritchie* v. *Perry*, 129 Me., 440, 447.

In the often cited case of *Fernald* v. *French*, 121 Me., 4, the defendant driver of an automobile well out on his own right-hand side of the road and not moving at an excessive rate of speed was suddenly confronted with the plaintiff's car, at nearly or quite a right angle, crossing directly in front of him. After a verdict for the plaintiff, the Law Court granted a new trial on the ground that, under the circumstances disclosed by the evidence, no negligence on the part of the defendant was shown.

Many other similar cases of real emergency might be cited, but study of the instant case discloses a different state of facts. That the Court in *Fernald* v. *French*, supra, had in mind that circum-

stances have much to do with each particular case is shown by the significant sentence on page nine of the opinion that there was nothing as far as the evidence showed to reasonably put the defendant on guard against the sudden appearance of the plaintiff's car or to warn him of its sudden turn across the street.

Carefully analyzed, the testimony of Mrs. Breton, that of the defendant, and that of Bonefant, discloses a situation in which it may well be said that Bonefant should have been reasonably put on his guard as to the possibility of the defendant's automobile crossing in front of him, a situation in which the power to avert an accident lay in the hands of the driver of the motorcycle under the simple and fundamental rule of reasonable care. Bonefant's own testimony and admissions show, to our minds conclusively, that he consciously, and with deliberate choice, took his chances as to passing in front of the defendant's car without accident, and that his conduct was not within the rule of reasonable care and that he was guilty of contributory negligence.

With full recognition of the rule as to jury verdicts, well established in this State, we feel, after a careful study of the case, that as a matter of law the jury was not warranted by the evidence as disclosed in the record in finding Laurier Bonefant free from contributory negligence, as they necessarily must have found in rendering a verdict in his favor, and in his case the motion is sustained.

The direct testimony of Laurier Bonefant, taken alone, unconnected with the results of cross examination, might have warranted the verdict of the jury as it was returned, but the situation disclosed on cross examination, taken in connection with the entire record of the case, the position of the automobile and the motorcycle after the accident, and the injury to the automobile, all together presented a situation which did not, in our judgment, warrant a verdict which was in effect that Laurier Bonefant was not guilty of negligence on his own part, and we can not escape the feeling that the jury must have been unduly influenced by sympathy and prejudice in order to have reached its conclusion.

In the case in which Edward Bonefant, the father, is plaintiff in his suit to recover for expenses and loss of services of the minor son, the motion is also sustained as the son's contributory negligence bars the father from recovery. *Vorrath* v. *Burke*, 63 N. J.

Law, 188, 42 Atl., 838; *Callies* v. *Reliance Laundry Co.*, 188 Wis., 376, 206 N. W., 198; *Tidd* v. *Skinner et al*, 225 N. Y., 422, 122 N. E., 247, 251; *Wueppeshal* v. *Connecticut Co.*, 87 Conn., 710, 89 Atl., 166. The same principle is clearly recognized in the case of *Kennard* v. *Burton*, 25 Me., 39. See also note 42 A. L. R., 717; also note 21 Ann. Cas., 143, 144.

Chester Carter was not an invited guest. That is apparent from the record. Even if he had been, his own thoughtless inattention to the whole situation might well have constituted a bar to recovery on his part.

According to his own testimony, it was clear that he was not paying the slightest attention to the motorcycle or its operation. He did not see the defendant car approaching. Just before the collision he was buttoning his coat and did not see the automobile until it was within "three to five feet." He had been over the road many times and knew the location of Brookside Garage, and on cross examination he said he was not paying any attention to driving or to the road or as to whether cars were ahead of or behind him, and that he took no precaution at all to see what was coming or where he was going. He also testified that he was not paying any attention to the speed of the motorcycle. Regardless of negligence on the part of Bonefant, his own evidence proves lack of due care on his part, and there being no question but that Laurier Bonefant must be regarded as Carter's agent, his negligence would bar Carter's recovery.

If the trip on the motorcycle were to be regarded as a joint enterprise, Carter would still be barred by the negligence of Bonefant, as it is a well recognized principle of law that the negligence of one engaged in such an enterprise is imputable to the other in a suit against a third party, but we make no finding as to whether or not there was a joint enterprise.

It becomes unnecessary to consider the exceptions or the question of damages, as the entry must be made as to each of the three cases,

*Motion sustained.*
*New trial granted.*