MOORE

v.

MIDDLEWEST FREIGHTWAYS, Inc.

No. 43448.

Supreme Court of Missouri.

Division No. 1.

April 12, 1954.

David R. Hardy, Sam B. Sebree, John S. Marley, Lane D. Bauer, Sebree, Shook, Hardy & Ottman, Kansas City, for appellant.

Lyman Field, Rogers, Field & Gentry, Robert S. Burns, Burns & Dicus, Kansas City, for respondent.

HOLLINGSWORTH, Judge.

Plaintiff recovered judgment in the sum of $39,388 for personal injuries sustained in a head-on collision of his motor truck with defendant's motor truck on U. S. Highway No. 40 about four miles west of Odessa, Missouri. Defendant appealed, assigning error: (1) in the overruling of its motion for a directed verdict on the ground plaintiff was guilty of contributory negligence as a matter of law; (2) in the denial of its challenge for cause of venireman Swofford as qualified to sit as a juror in the case; (3) in the refusal of a new trial because two jurors on voir dire examination had concealed facts material to their qualifications to sit as impartial jurors; (4) prejudicially improper conduct of plaintiff's counsel throughout the trial; and (5) excessiveness of the verdict.

Determination of the first assignment requires that we consider the admitted facts, disregard all of defendant's evidence in conflict with that of plaintiff and treat as true all of plaintiff's testimony and all favorable inferences reasonably flowing therefrom.

The collision occurred at 4:00 a. m., on March 24, 1950. Plaintiff and Frederick Finkeldei, the operator of defendant's truck, were the only witnesses to it. Plaintiff had never before driven over that portion of the highway.

At the point of the collision and for more than 600 feet on each side thereof Highway 40 extends due east and west. It is paved with concrete, 21 feet in width, with a center line painted thereon. Plaintiff was driving east. His truck, a 1950 Chevrolet, was loaded with 237 bushels of corn, the total weight of truck and load being 19,000 pounds. Defendant's truck was being driven west. It was an International truck and trailer outfit, having an overall width of about 7 feet. Loaded with steel, its total weight of load and vehicle was 45,000

pounds. The collision occurred on plaintiff's right side of the center of the highway. A plat introduced in evidence by plaintiff shows the shoulder on the south side of the pavement to be 9 feet wide and level. It then slopes a distance of 8 feet to the bottom of a ditch, the south bank of which rises to a height of 9 feet.

As plaintiff, driving east at a speed of about 45 miles per hour, approached the point of collision, he went through a low, flat area, across a bridge, and started up a 4.6 per cent incline which extended for a distance of 900 feet. The collision occurred about 500 feet east of the bridge. As he crossed the bridge he saw the clearance lights on the top of the trailer of defendant's oncoming truck about 1,200 feet east of him. He could not then see the position of the truck on the highway, but he dimmed his lights. The headlights on defendant's truck first came into his view about 900 to 1,000 feet east of him. He then saw that the headlight on the left side of defendant's truck was directly over the center line of the highway and knew that the rear dual wheels of defendant's truck were over the center line on plaintiff's side of the highway. Plaintiff switched his lights to high and again dimmed them, but did not thereafter "blink" them and did not sound his horn. He was then going up the incline at a speed of about 45 miles per hour. Defendant's truck was approaching him at a "strong 45 miles" per hour, which rate of speed continued without reduction until the collision. Noticing that defendant's truck was gradually coming over on his side of the highway, plaintiff started to apply his brakes lightly so as to give defendant's truck more time to return to its side of the highway. As defendant's truck came closer, travelling in a straight line further onto plaintiff's side, plaintiff pushed harder on his brakes, thinking that defendant's truck would return to its own side. He looked around to see the kind of shoulder there was to his right. It appeared to be only 6 to 7 feet wide, "not wide enough". He thought it to be a hard, dirt shoulder, not wet or slick, the temperature was 20 to 30 degrees, but he did not know its condition.

He did not know what to do because he "did have a load on". If he pulled off the shoulder, "there was a bank there". If he turned onto the shoulder, it "might throw him out of control of his truck"; with the load he had, it would tend automatically to cut his front wheels to the right.

Plaintiff gradually reduced his speed from 45 miles per hour until he was going 28 to 32 miles per hour when the collision occurred. As he approached and reached the point of collision, his truck was at all times on the right side of the pavement, the outer wheels being 4 to 6 inches from its edge. Plaintiff could have stopped his truck within a distance of 175 feet. When he was 500, 400 or 300 feet west of the point of collision, he could have slowed his truck and driven onto the shoulder, but he did not at that time think there would be a collision and kept hoping there would not be until the trucks were within 10 to 20 feet of each other. At that time he took his foot off the brakes and started to shift gears, which would give him the added power to maneuver his truck out of its position on the highway. He did not get the gears shifted and for a moment went without his brakes applied. When the trucks were about 500 feet apart, defendant's truck was slightly more than one-third over on plaintiff's side and at the time of the collision it was two-thirds over. Plaintiff was severely injured by the force of the collision.

Defendant's operator, Finkeldei, testified, in substance: He first saw plaintiff 800 to 1,000 feet away from him. At that time each truck was on its right side of the highway, defendant's truck going about 35 miles per hour and plaintiff's about 45 miles per hour. When plaintiff was about three or four "lengths of my outfit away from me", he drove over on defendant's side of the highway, and he, Finkeldei, then turned sharply to the left to try to avoid the collision, but could not do so.

Defendant contends that "reasonable minds could not differ on the proposition that plaintiff failed to use the highest degree of care for his own safety when he

drove straight to disaster from the time the vehicles were 900–1000 feet apart without any overt act for his own protection", and that this court should declare him guilty of contributory negligence as a matter of law. Plaintiff contends that at the least his actions under the circumstances shown in evidence made the issue of his contributory negligence a jury question.

Defendant argues that plaintiff should have known almost from the instant he first saw defendant's truck that the operator was not going to return to his own side of the highway and that as the vehicles came closer together plaintiff was unquestionably chargeable with such knowledge in ample time to have stopped his vehicle or to have turned onto the shoulder and avoided the collision or to have warned defendant's driver by horn or by "blinking lights" so that he would return to his own side. In support of its position, defendant relies strongly upon the case of Wininger v. Bennett, Mo.App., 104 S.W.2d 413, 414, which it says is on all fours with the facts in this case. In some respects the facts are similar, but the differences are so pronounced and the facts upon which that case turned so foreign to the situation involved in the instant case, we do not think it analogous.

In that case the collision occurred at night on a gravel road. Plaintiff testified: "That he was driving his automobile south at a speed of from 30 to 35 miles per hour. * * * that he was riding with his left arm out of his car; that when he got within three or four hundred yards of defendants' truck he saw that it was on the wrong side of the road coming straight toward him; that it continued to occupy that side as he approached it; that he did not slacken the speed of his car, but continued at the above rate until the two vehicles came together; that the left front corner of his car struck the truck behind the cab and about the center of that side; that his left arm was caught between the car and the side of the truck, was broken and bent back so that his hand broke the window of the back door of his car on that side; that no part of the truck entered his car, and that all of the damage to his car was back of the front door; that his arm was so injured that it was necessary to amputate it."

The opinion holds that this testimony convicted plaintiff of contributory negligence as a matter of law. In so doing it necessarily proceeds upon the theory that plaintiff, in the exercise of the highest degree of care for his own safety, had no right ever to assume from the moment he first saw defendants' truck that it would return to its own side of the highway, and further assumes, without evidentiary support, that plaintiff, with reasonable safety to himself, could have turned his car to the right or the left, (it does not say which) or stopped it and avoided the collision. The opinion then shifts to another ground. We quote: "The testimony in this case shows that no part of the truck entered the inside of plaintiff's automobile, and that all of the damage to the automobile was back of the front window, so it is perfectly evident that if plaintiff's arm had not been protruding from his car to such an extent that his hand was caught and his arm bent back and broken, he would not have received any personal injury at all. While it may not be negligent for one to ride with his hand and arm out of the window of a car, under ordinary circumstances, when the road is clear, it is the grossest negligence to do so under circumstances as were detailed by plaintiff in this case. Because of the acts of negligence on the part of plaintiff as hereinbefore set out, it is our opinion that defendants' demurrer should have been sustained." And, finally, the court casts aside plaintiff's testimony and proceeds to adopt the testimony of defendants' witnesses as the facts of the case and concludes that plaintiff's automobile did not proceed at all as plaintiff had testified, but that defendants' truck was on its own side of the road, and that plaintiff, who had been drinking, approached defendants' truck at a high rate of speed, zigzagged his automobile from one side of the road to the other, missed the front end of defendants' truck and then swerved to the left into its side. In other words, although called upon to decide only the question of plaintiff's contributory negligence as

a matter of law, from the viewpoint of plaintiff's evidence, the court, in effect, determined the case upon its merits in accordance with what it believed the facts to be. Its decision is not persuasive of the question here presented.

Defendant has also cited the following cases from other jurisdictions: Lundy v. United States, D.C., 78 F.Supp. 354; Bonefant v. Chapdelaine, 131 Me. 45, 158 A. 857; Ritchie v. Perry, 129 Me. 440, 152 A. 621; Guillory v. Bordelon Lines, Inc., La. App., 23 So.2d 669; Engholm v. Northland Transportation Co., 184 Minn. 349, 238 N. W. 795; Sudol v. Gorga, 346 Pa. 463, 31 A.2d 119; Oberfeld v. Eilers, to Use of California Ins. Co., 171 Md. 332, 189 A. 203; Farrell v. Cameron, 98 Utah 68, 94 P.2d 1068.

Space will not permit discussion of each of these cases. Each is readily distinguishable upon its facts or upon the legal question involved. For instance, in the first five above listed the disaster occurred in the daytime and the evidence definitely revealed that the party occupying the position of plaintiff in this case was able to see and accurately appraise the situation in ample time to have avoided the disaster by changing his course with safety to himself. In the last three cases above cited the question was merely whether a submissible case of negligence had been made against the party in the position of plaintiff in this case.

█ When plaintiff first saw defendant's truck encroaching upon his side of the highway 900 to 1,000 feet from him, he had the right to assume it would turn back to its own side in time to avoid the collision and to continue to so assume until he knew or by the exercise of the highest degree of care for his own safety should have known that it would not do so. And until he had or in the exercise of the highest degree of care should have had such knowledge, no mandatory duty rested upon him to utilize the shoulder of the highway to avoid the collision. McGuire v. Steel Transportation Co., 359 Mo. 1179, 225 S.W.2d 699, 701, 702; Lemonds v. Holmes, Mo.App., 236 S.W.2d 56, 60; 60 C.J.S., Motor Vehicles, §

317, page 735. Furthermore, after plaintiff became chargeable with such knowledge, he was obliged to turn out on the shoulder (no contention is made that he could have turned to his left) only if it was practicable and not dangerous to do so. 60 C.J.S., Motor Vehicles, § 319, page 738.

We think the question whether plaintiff was guilty of contributory negligence as a matter of law should not be decided solely upon the evidence of what a daylight inspection of the terrain at the site of the collision revealed as to the possibility of plaintiff's avoiding the collision by turning onto the shoulder with reasonable safety to himself. There is more to the case than that. We must consider the situation as it reasonably appeared to plaintiff that night and determine whether as a matter of law he failed to exercise the care for his own safety that a very careful and prudent person would ordinarily exercise under similar circumstances.

█ Defendant says it should have been apparent to plaintiff from the time he first saw defendant's truck that its driver was oblivious of his position on the highway. There is no evidence that the driver was oblivious. Neither is there any evidence that plaintiff thought him to be in that state. To the contrary, plaintiff thought and hoped, until it was too late to avert the collision, that defendant's driver would return to his own side. Furthermore, defendant's driver testified he was not oblivious. Defendant says, however, we cannot consider that admission because it is lifted out of context and contradicts plaintiff's testimony, citing Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S.W.2d 600. We do not think so. The admission is not in conflict with plaintiff's testimony.

█ Defendant further contends that plaintiff should have concluded that when its driver continued to drive the truck in a straight line without change of speed over into plaintiff's lane he would not turn back to his lane. We do not think that conclusion necessarily follows. Could it not as well be inferred that in continuing to drive

in a straight line defendant's driver was actually in full control of the truck and purposefully driving in a straight line, but was merely momentarily negligent in permitting it to drift to the left and that he would right his course in time to avert the collision? The question as to when and where plaintiff, in the exercise of the highest degree of care for his own safety, should have known that defendant's driver could not or would not return its truck to its own side was peculiarly a question for the jury.

But that does not entirely dispose of the question of plaintiff's contributory negligence. Once the jury determined when and where plaintiff, in the exercise of the highest degree of care, could no longer assume defendant's truck would right its course, the further question was presented: Could and should plaintiff, in the exercise of the highest degree of care for his own safety, have done anything he failed to do to avoid the collision? It must be remembered that defendant created the dilemma with which plaintiff was confronted. Surely, in such a predicament, plaintiff would not be required to do that which then and there reasonably appeared to him to endanger him as much or more than did the impending collision.

Plaintiff's testimony showed that when confronted with the situation he slowed his speed, considered the weight of his truck and its load, considered the tendency of a loaded vehicle to turn abruptly to the right when its front wheels strike a dirt shoulder, considered the width of the shoulder which, in the nighttime, appeared to him to be not wide enough to go upon, saw the ditch adjacent to the shoulder and the embankment beyond it, and in desperation shifted gears preparatory to taking advantage of any exit that presented itself. We cannot say as a matter of law that under this testimony plaintiff is to stand convicted of contributory negligence.

The evidence does not conclusively show that by sounding his horn or by further "blinking" his lights plaintiff would have averted the collision. Defendant's driver was as fully aware of the position of both vehicles as was plaintiff. Neither does the evidence conclusively show that plaintiff could have stopped his vehicle and avoided the collision after he became chargeable with knowledge that defendant's truck was not going to turn back to its own side.

In the recent case of Lemonds v. Holmes, Mo.App., 236 S.W.2d 56, 58, under facts comparable to those here involved, the Springfield Court of Appeals, in a well reasoned opinion by the late William L. Vandeventer, J., held that the defendants (who were in the position of plaintiff in this case) were not guilty of contributory negligence as a matter of law in failing to avoid collision with an automobile parked on the wrong side of the highway in the path of defendants' line of travel.

In that case the collision occurred in the nighttime. An unoccupied automobile, with its headlights burning and fronting north, was parked on the west portion of the pavement of a north-south highway. Defendants were driving southward on their right side of the pavement with plaintiff and another girl as their guests. They saw the lights of the parked automobile when they were about one-fourth mile of it. The defendant who was driving "blinked" his lights several times, signalling the parked car, in an endeavor to cause the supposed driver thereof to dim his lights. "When he made the first signal, he took his foot off the accelerator but there was no response from the car ahead. It appeared to him that the car was advancing in the middle of the highway and he assumed that the driver would turn to the proper side of the highway before they met. He watched the road all the time and he reduced his speed when he was about 300 yards from the DeSoto (the parked car). He had applied his brakes and slowed down from about 50 miles an hour to 35 or 40, when he discovered the DeSoto was not going to turn. He applied his brakes again and turned to the left in an attempt to avoid a collision and the right half of the front of the Ford (defendants' car) struck the right half of the front of the DeSoto, resulting in the injuries complained of. At the time of the

collision, his estimated speed was twenty miles per hour." The court held: "Neither do we think that Young and Holmes (defendants) were guilty of negligence as a matter of law. When Young passed a truck and started down the straight stretch of highway, he saw the parked DeSoto approximately 300 yards ahead. It appeared to be in the center of the road and advancing toward him. He knew that many drivers would drive in the center of the road but pull to their right when meeting traffic. He assumed that was the situation here. However, he took his foot off the accelerator and blinked his lights as a signal for the car ahead to switch his lights to dim. When it appeared that the car was not going to turn to its right, he applied his brakes and later turned to the left, endeavoring to avoid a collision. At the time of the collision, his speed, he says, was 20 miles per hour. A motorist is not required to slow down or stop, merely because headlights are advancing in his direction. It is only when he has knowledge, or by the exercise of the highest degree of care could have such knowledge, that the advancing car is not intending to move to the right, that he must take all reasonable precautions to avoid a collision. We think whether he was negligent under all the facts in this case was a jury question for the jury, * * *."

We have concluded and hold that plaintiff in this case was not guilty of contributory negligence as a matter of law.

During examination of the venire, counsel for plaintiff closed his narration of the nature and purpose of the questions he would propound to them with this statement: "Now, with that recital, have any members of the panel ever had any kind of a claim where you got your doctor bills taken care of or paid some money damages or a Workmen's Compensation claim?"

The following then ensued:

"Your name, sir?

"Venireman Swofford: My name is Swofford.

"Mr. Field: What was the nature of that claim, just briefly, Mr. Swofford?

"Venireman Swofford: During the Ford strike of 1937—'41.

"Mr. Field: The fact that you had a claim and it has been disposed of, that wouldn't prejudice you in this case, would it?

"Venireman Swofford: More or less, yes, sir.

"Mr. Field: It would prejudice you in favor of the plaintiff; you think it would? .

"Venireman Swofford: Against the big fellow.

· "Mr. Field: Mr. Swofford, you are the only one, of course, who can answer the question, and he has brought a suit against the Middlewest Freightways Corporation, which is an interstate carrier—it's a pretty big carrier. Do you think, however, that you could listen to the evidence and hear the instructions of the Court and reach your verdict based solely on that, uninfluenced by any feeling you might have against a big company?

"Venireman Swofford: Yes.

"* * * * * *

"Mr. Trusty (out of the hearing of the panel): I'd like to challenge that juror for cause. Before he was asked leading questions by Lyman, he said he would be very prejudiced against any big fellow.

"The Court: I understood it the same way, but perhaps you had better ask him another question or two yourself.

"* * * * * *

"Mr. Trusty (in the presence of the panel): Mr. Swofford, just a question or two. You say you had some claim in 1937, was it?

"Venireman Swofford: Yes.

"Mr. Trusty: Was that for personal injuries?

"Venireman Swofford: Yes.

"Mr. Trusty: What was the nature of that, sir?

"Venireman Swofford: Labor trouble at Ford, 1937 through '41.

"Mr. Trusty: Did you make a claim against Ford for something that happened there? That is what I didn't understand.

"Venireman Swofford: Labor troubles; about nine hundred of us made that claim.

" * * * * * *

"Mr. Trusty: I understood you to say that you thought you'd be prejudiced against any big fellow. Is that what you said?

"Venireman Swofford: Not beyond a fair and reasonable doubt, no.

"Mr. Trusty: How prejudiced would you be? That is what we are here to find out.

" * * * * * *

"Venireman Swofford: I couldn't be anything but fair about it, no.

"Mr. Trusty: Well, do you have any feeling at all that you would rather see a person win a lawsuit than a corporation?

"Venireman Swofford: Not if it was right.

"Mr. Trusty: Well, I'd like to ask you, sir, to explain your statement, then. Perhaps I misunderstood you, but I thought that you said, when Mr. Field was asking you, that you would have a prejudice against a big fellow in this—in any case.

"Venireman Swofford: Not in any case, no sir.

"Mr. Trusty: * * * Do you feel that you had some treatment by Ford that was unfair?

"Venireman Swofford: Yes, sir.

" * * * * * *

"Mr. Trusty: And because of that you have a feeling against companies in general.

"Venireman Swofford: Not in particular, no; I have a company of my own.

"Mr. Trusty: What kind of a company?

"Venireman Swofford: Sewing machine outfit.

"Mr. Trusty: I just want to ask you now, Mr. Swofford, this one question: Do you think this is any feeling you have at all against companies which might cause you in any way, however small a degree, to be swayed one way or the other in your judgment of this particular case?

"Venireman Swofford: No.

" * * * * * *

"The Court (out of the hearing of the panel): Let the record show the challenge is overruled."

Thereafter, counsel for defendant advised the court that its acceptance of venireman Swofford as a qualified member of the panel of eighteen veniremen had forced him to include Swofford as one of the three peremptory challenges allowed him by statute, as a result of which he was further required to leave unchallenged another member of the panel (whose name he gave to the court and counsel) he would otherwise have stricken had he not believed Swofford was the more objectionable of the two.

 ▪ The trial judge is and should be vested with broad discretion in determining the qualifications of veniremen to sit as jurors and his rulings should not be disturbed unless they are clearly and manifestly against the evidence. There are cases in this State holding that even though the qualifications of a juror were highly questionable, yet if the objecting party struck his name from the qualified list, and an unanimous verdict was reached

by the jury finally selected, and no prejudice was shown, the error of the trial court would not be deemed prejudicial. See Ruschenberg v. Southern Electric R. Co., 161 Mo. 70, 87, 61 S.W. 626; Parlon v. Wells, 322 Mo. 1001, 17 S.W.2d 528, 530; Knudsen v. Kansas City Public Service Co., Mo.App., 141 S.W.2d 252, 259; and cases cited in the aforesaid cases. But it is apparent that the opinions in those cases overlooked certain fundamental principles of the right of trial by jury as contemplated by our Constitution. The better reasoned cases hold: "The right of trial by jury guaranteed by our Constitution, if it is to be worth anything, must mean, as this court has said, 'the right to a fair and impartial jury.' (Citing case.) As this court also said, in that case, 'to prescribe whatever will tend to procure the impartiality of jurors in the trial of cases, is not only within the competency of the Legislature, but is one of its highest duties.' Certainly it is also one of the highest duties of courts, in the administration of the law concerning selection of jurors and juries, to seek to accomplish that purpose by enforcing the qualifications prescribed by statute. Certainly also a party is entitled, unless he waives it, to a jury of twelve impartial qualified men. Even though three-fourths of them can decide a civil case, parties are entitled to have that decision, whether for them or against them, based on the honest deliberations of twelve qualified men." Lee v. Baltimore Hotel Co., 345 Mo. 458, 463, 136 S.W.2d 695, 698, 127 A.L.R. 711. See also Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459, 463; Harrison v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 348, 351. The better reasoned cases also hold that where a challenge for cause is erroneously overruled and the challenging party is compelled to use one of the three peremptory challenges allowed him by law to get rid of him, it cannot be said that because the verdict of the jury finally empanelled was unanimous against him, he was not prejudiced. Carroll v. United Rys. Co., 157 Mo.App. 247, 260–266, 137 S.W. 303, 306–308; Murphy v. Cole, 338 Mo. 13, 88 S.W.2d 1023, 1024, 103 A.L.R. 505. We think they should be followed. It is also fundamental that the

vernireman is not the judge of his own qualifications. Piehler v. Kansas City Public Service Co., supra, 211 S.W.2d loc. cit. 463.

Mr. Swofford admitted prejudice "against the big fellow", and was thereupon promptly advised by plaintiff's counsel that defendant was "a pretty big carrier". While he thought he could be governed by the evidence and the instructions, he, nevertheless, almost immediately thereafter was only willing to admit that he would not be prejudiced "beyond a fair and reasonable doubt" against the "big fellow"; and, at last agreed that he did not *think* his feeling against all companies in general would sway him in a particular case because he, himself, had a "sewing machine outfit".

We have said of a somewhat similar state of facts: "Where a juror admits, as Hartman did, that he had a prejudice against street car companies of 8 or 10 years' standing, and that that prejudice existed up to the time he gave his first answer upon his voir dire, yet, after being examined and cross-examined by counsel and the court, and being put in the position of having to say he would allow that prejudice to overcome the obligation of his oath as a juror, or, on the other hand, to say that he could divest his mind of such a prejudice and fairly try a case, and that the prejudice had become dissipated within the last five minutes, it can scarcely be reasonably said that such a juror fills the requirements of our system of jurisprudence." Theobald v. St. Louis Transit Co., 191 Mo. 395, 417, 90 S.W. 354, 359.

We are convinced that vernireman Swofford should not have been permitted to remain on the qualified panel, and that his acceptance by the court denied defendant the right of trial by a fair and impartial jury as contemplated by our Constitution.

The conclusions above reached make it unnecessary to review the remaining assignments.

The judgment is reversed and the cause remanded.

All concur.