Gaylen E. GRIMM, Plaintiff-Respondent,

v.

John GARGIS, Administrator of the Estate of George Gargis, Deceased, and Continental Exterminators, Inc., Defendants-Appellants.

No. 45399.

Supreme Court of Missouri, Division No. 1.

May 13, 1957.

Rehearing Denied June 10, 1957.

Henry W. Buck, William A. Rundle, Jr., Morrison, Hecker, Buck, Cozad & Rogers, Kansas City, Ronald S. Reed, St. Joseph, for appellants.

John E. Downs, St. Joseph, Ben W. Swofford, Robert A. Schroeder, John C. Milholland, Kansas City, for respondent, Swofford, Schroeder & Shankland, Kansas City, of counsel.

HOLMAN, Commissioner.

On Saturday afternoon, September 19, 1953, plaintiff, Gaylen E. Grimm, was injured in the crash of a "Cessna 170" airplane owned by Continental Exterminators, Inc., and being piloted by George Gargis. The pilot was killed in the crash. In this action plaintiff sought to recover damages for his personal injuries from the estate of said deceased and the corporate owner of the aircraft. The jury returned a verdict for $10,500 against both defendants. They have duly appealed from the ensuing judgment.

The evidence disclosed that it was customary for pilots and others interested in aviation to gather at Rosecrans Airport in St. Joseph, Missouri, on Saturday afternoons to fly planes and to discuss aviation while drinking coffee in the coffee shop. On this particular afternoon plaintiff, George Gargis, Pete Schuler, and another flew to Kansas City in Schuler's plane. Upon their return, and after some discussion in the coffee shop, they, decided to make a flight over a wild fowl reserve north of St. Joseph, and Gargis said, "Let's take my plane. I want to blow the dust off of it." On this flight, plaintiff, Gargis, and Schuler were joined by Bob Madinger who had just arrived at the airport. The plane in question had been purchased by

the corporate defendant less than a month before and had been flown only a few hours. It was a dual control plane, but the undisputed evidence was that Gargis was the only pilot and was in control of the plane. Upon entering the plane Gargis sat in the left pilot seat, Schuler in the right front seat, Madinger in the left rear, and plaintiff in the right rear seat. After the plane was warmed up Gargis made some statement to the effect that he was going to make a short field take-off. A short field take-off is a maneuver used where there is limited space available. Its object is to get the plane off the ground quickly and climb enough to clear existing obstacles in a short running or flying distance. That manner of take-off is abnormal in the sense that, except for practice, it is used only where conditions make it necessary. The expert testimony was that a short field take-off is not dangerous if properly executed.

To a large extent an aircraft is caused to lift and stay in the air by the airflow over the wing area. A short field take-off is accomplished by the adjustment of flaps located in each wing. These are regulated by a lever which may be set in three different notches. The first notch will set the flaps at 20 degrees, the second at 40 degrees, and the third at 60 degrees. In a normal take-off the flaps are in neutral. In a short field take-off it is recommended that the flaps be set in the first notch, but it is optional with the pilot as to whether he uses the first or second notch. The normal speed at which a "Cessna 170" will leave the ground is 70 to 80 m.p.h. However, when the flaps are lowered it slows the speed of the plane but it will lift from the ground quicker and at a slower speed. The danger in this procedure is that if the rate of climb is too steep the plane will stall, and unless corrective measures are taken instantly the plane will fall. A stall occurs when the aircraft overclimbs to the point that it ceases to move forward, and, since there is no flow of air over the wings the lift is eliminated and the plane ceases

to fly. The instant plane was equipped with a stall warning signal which would make a noise similar to a foghorn when the plane was approaching a stall.

In executing the take-off in question Gargis set the flaps in the second notch. The plane left the ground while going from 40 to 50 m.p.h. which is dangerously slow because at that speed it could stall at any time. Immediately after the craft "broke" ground the stall warning sounded and it continued to sound intermittently until the actual stall occurred. When the plane reached an altitude variously estimated at from 75 to 150 feet it came to a "standstill"; began to "wobble" and went "into a violent shudder." At this point one wing dipped and the plane spiraled downward and crashed. Schuler and Madinger did not appear to have been injured, but, as stated, Gargis was killed and plaintiff injured.

There is no dispute in the evidence as to the cause of the crash and the action that the pilot should have taken in order to avoid it. The crash was caused by the abnormally sharp rate of climb (contributed to by the weight of four heavy men) which reduced the speed of the craft to the point where it was insufficient to complete the climb. As the plane approached a stall the proper procedure was to reduce the amount of flap used, thus lowering the nose of the plane and permitting it to gain speed before again continuing the climb. Instead of following that procedure Gargis, when the plane was dangerously near a stall, put the "flaps" lever in the third (60 degree) notch, thus raising the nose of the plane even more instead of lowering it. The effect of that action was to further decrease the speed, thus maintaining the stall which caused the plane to crash. Additional facts will hereafter appear in the course of our discussion of the various points briefed.

We will first consider the contention of defendants that the court erred in denying their separate motions for a

directed verdict for the reason that the facts in evidence were not sufficient to authorize a finding of negligence on the part of the deceased pilot, and for the further reason that plaintiff was guilty of contributory negligence as a matter of law. There is no merit in either contention. The petition was based on the res ipsa loquitur doctrine. However, recognizing that the proof disclosed specific acts of negligence on the part of the pilot, resulting in the crash, plaintiff properly submitted an instruction (given by the court) which required a finding of specific negligence as a predicate for his recovery. Jarboe v. Kansas City Public Service Co., 359 Mo. 8, 220 S.W.2d 27. Moreover, our foregoing statement discloses ample evidence from which the jury could reasonably find that the crash resulted from the pilot's failure to use ordinary care in doing the acts which brought about the stall of the plane and his failure to take available remedial steps to regain a safe flying speed. Furthermore, even if we assume that plaintiff heard Gargis say that he was going to make a short field take-off (and made no protest) he would not be guilty of contributory negligence as a matter of law. Gargis was an experienced pilot with 1,200 hours flying time and there was evidence that a short field take-off is not hazardous when properly executed. There was no evidence to indicate that plaintiff should have anticipated that he would perform that maneuver in a negligent and dangerous manner.

The corporate defendant next asserts that its motion for a directed verdict should have been sustained because there was no evidence that the deceased pilot was acting as the agent of said corporation. Plaintiff alleged that at the time and place in question the airplane was "owned and operated by defendant Continental Exterminators, Inc., by and through its agent, servant and employee George Gargis, deceased." His theory of recovery against said defendant is more specifically disclosed in Instruction No. 3 wherein a verdict against that defendant was predicated upon a finding that "at all times mentioned in Instruction No. 2 that George Gargis was acting within the scope of his authority as president of defendant Continental Exterminators, Inc., and was using said airplane at said time and place for entertainment and advertising purposes." Upon that issue the evidence indicated that the plane was owned by Continental Exterminators, Inc.; that the pilot, George Gargis, was the president of that corporation, and that the said company paid all the expenses for the operation and maintenance of the plane. Emma George, a bookkeeper for said defendant, testified that she had made a trip to Shenandoah, Iowa, in one of the three planes the company had owned, on the business of the company, and that George Gargis had piloted the plane.

Plaintiff read in evidence portions of the deposition of John T. Gargis, who was a brother of George, was vice-president of the company at the time of the accident, and succeeded his brother as president. He stated that Continental had successively owned three planes between 1950 and the date of the casualty in question; that his brother had acted as pilot of these planes and that as far as he knew the planes were intended to be used in furthering the business by making the company name better known. On this subject he stated,

"Q. For what purpose was a plane purchased by the company? A. To the best of my knowledge it was purchased for advertising purposes.

"Q. Would that be in the field of public relations? A. Yes. * * *

"Q. Do you know what George used that airplane for, generally? A. For business purposes.

"Q. That was in connection with the advertising purposes you spoke of? A. Yes.

"Q. And I take it the president of the company also did some entertaining for

business purposes? A. I don't know what his personal relations was with it.

"Q. I'm speaking of taking business associates to dinner and that sort of thing around St. Joseph. A. I think so, yes."

■ In order to recover against Continental, plaintiff had the burden of proving that George Gargis was, at the time of the ill-fated flight, acting within the scope of his employment as an agent, servant, and employee of said defendant. Plaintiff says that the evidence is sufficient to support an inference that Gargis, as president of Continental, was acting for said corporation, within the scope of his authority, in advertising Continental and creating good will toward the business. With this we do not agree.

■ In this connection we observe that it is very doubtful that the evidence would reasonably support any finding that Gargis, as president, had the actual, apparent or implied authority of the corporation to invite plaintiff to take a flight in the plane and thus bind the corporation to accept him as a guest and to exercise toward him ordinary care for his safety. See Roth v. J. N. Roth & Co., 363 Mo. 767, 253 S.W.2d 802, and cases cited therein. However, we need not decide that question because, as we view the testimony herein, there is no evidence that Gargis was, in fact, acting within the scope of his employment and in furtherance of the business of Continental in making the flight in question. An officer of a corporation, in rendering services to it, is an employee or servant of the corporation and his authority is limited to acts within the ordinary course of its business and within the scope of his authority, and does not include acts performed solely for his own pleasure or benefit.

The instant evidence was that the planes owned by Continental had been used in one instance on a trip for the corporation and that they were purchased "for advertising purposes" to make the company name better known. There is no pretense that Gargis was undertaking this flight on any specific mission for Continental. Moreover, we can see no basis for any inference that it was for advertising purposes. The name of the corporation did not appear on the plane. In inviting these men to go with him, Gargis did not even refer to the plane as being Continental's but said, "Let's take *my* plane." There is no showing that his guests were either actual or potential customers of the corporation. With the exception of Madinger, they were friends and associates engaged in the avocation of flying airplanes. There was evidence that Gargis did some entertaining for business purposes, but there is nothing to indicate that he had any authority to use the plane for that purpose or that he actually did make such use of it. As indicated, we have concluded that there is no substantial evidence from which the jury could reasonably find that Gargis, in undertaking the instant flight, was acting in behalf of Continental and hence the court erred in overruling the motion of said defendant for a directed verdict.

We will now proceed to consider the points briefed concerning alleged trial errors relating to the judgment against defendant John Gargis, administrator. In view of our ruling in regard to the corporate defendant we will hereafter use the singular in referring to the contentions made in the joint brief filed by defendants.

■■ The contention is made that the trial court erred in overruling the motion of defendants for a pre-trial physical and mental examination of plaintiff. Section 510.-040 RSMo 1949, V.A.M.S., provides that the court, "on motion for good cause shown," may order a party to submit to such an examination. The granting or denial of the order is a matter resting within the discretion of the trial court. Enyart v. Santa Fe Trail Transp. Co., Mo.Sup., 241 S.W.2d 268. In the instant case it appears that evidence was presented upon the hearing of the motion but appellant did not cause that evidence to be included in the transcript. It should be apparent that we can-

not properly review this assignment without some knowledge of the evidence that was before the trial court. However, the evidence at the trial indicated that between April 13 and May 3, 1954, plaintiff submitted to a series of physical examinations made at the request of a representative of the Western Adjustment and Inspection Co. (apparently representing defendant's insurer) and that the information obtained was made available to the attorneys for defendant. Moreover, at the time the instant motion was heard plaintiff agreed to submit to a mental examination and such was accordingly made. In this situation we cannot say that the trial court abused its discretion in overruling the motion.

Defendant next contends that the trial court erred in overruling his motion to discharge the jury panel because the subject of liability insurance had been over-emphasized upon the voir dire examination. No complaint is made in regard to the general questions asked by plaintiff's counsel as to whether any member of the panel was employed by, or financially interested in, the insurance company admittedly conducting the defense. The matters complained of were the answers of a number of jurors to general questions relating to their involvement in automobile collisions, and the resulting claims, as follows:

"Q. Have any of you been in an accident, whether you have been paid or not? Juror Richard Russell: I was in a car accident with another car. The insurance company paid for it.

"Q. Your insurance company or the other guy's insurance company? A. My insurance company paid for mine and I had to pay part of his.

"Q. That didn't come out of your pocket? A. Yes. At that time my liability insurance had lapsed and I had forgotten all about it.

"Juror Paul De Lawder: I was involved in an accident but I was at fault.

"Q. Your insurance company paid for it? A. Yes, sir, they took care of it. I didn't even know what the terms were.

"Q. You didn't know what the terms were. Your insurance took care of it.

"Mr. Reed: If the Court please we object to the line of interrogation which Mr. Downs has taken. We are going to move the Court to discharge this panel * * *.

"Juror Howard Mitchell: I run into a guy at Stanberry in 1953, and the insurance company paid off. Nobody was injured.

"Q. Nobody sued anybody? A. No.

"Juror Archie West: A fellow hit my car parked in front of my house one time. He didn't have any liability insurance or no money so I turned it over to my insurance company and it cost me $50.

"Q. About when was that? A. It'll be three years this February.

"Mr. Reed: We again would like to move the Court to discharge this panel" etc.

Each of the motions to discharge the panel were overruled.

The foregoing may have had a tendency to accentuate the matter of liability insurance in the minds of the prospective jurors. However, it appears to us that the subject developed in a natural manner, was not unduly emphasized, and we see no evidence of bad faith on the part of plaintiff's counsel. It should also be noted that the questions which specifically called for answers relating to insurance were not objected to.

It is also said that the trial court erred in denying the defendant's challenge for cause of panel member, Mansfield Hord. It developed in the interrogation of the panel that Juror Hord had known plaintiff for thirty years and had played ball with him as a child. On the morning following the crash Mr. Hord went to the Methodist Hospital to visit his brother, and as he walked down a corridor he happened to look in a room and saw plaintiff in bed. He

stepped into the room and visited briefly with plaintiff and his wife. He stated that he remembered nothing about the conversation except that he was informed that plaintiff had been in an airplane accident. Mr. Hord further stated that he did not inquire about the extent of plaintiff's injuries and received no impression as to the seriousness of same. In regard to the effect of this occurrence the following is significant: "The Court: Could you sit as a juror in this case and disregard any conversation you had at the hospital or the fact that you saw him there, and render a fair and impartial verdict, based on the evidence as you hear it in the courtroom and on the law as I will give it to you in the instructions? Juror Hord: I could. The Court: Can you think of any reason why you could not serve as a fair and impartial juror in this case? Mr. Hord: No, sir. The Court: Do you have any opinions, previous opinions, based upon what you saw or heard there in the hospital, in this case? Juror Hord: No." As indicated, the court overruled the challenge for cause and defendants removed Mr. Hord from the panel by the use of one of their peremptory challenges.

"In the administration of justice, it is all important that unbiased jurors be selected. This matter should always receive close attention on the part of trial courts, and the rules of law pertaining thereto should not be relaxed." Webb v. Missouri-Kansas-Texas R. Co., 342 Mo. 394, 116 S.W.2d 27, 29. However, it is well settled that, "The trial judge is and should be vested with broad discretion in determining the qualifications of veniremen to sit as jurors and his rulings should not be disturbed unless they are clearly and manifestly against the evidence." Moore v. Middlewest Freightways, Inc., Mo.Sup., 266 S.W.2d 578, 585. We have carefully examined the circumstances surrounding each of the foregoing assignments and have concluded that we cannot confidently say that the trial court abused its discretion in either of the rulings complained of.

In the cross-examination of witness Schuler it developed that he, a licensed pilot, was familiar with the planes that had been flown by George Gargis. The court refused the offer of defendant to prove by this witness that the flaps on the wings of the plane George was accustomed to flying were not as wide as the flaps on the wings of the plane involved in the crash. In support of his assertion that this ruling was error defendant argues that the larger flaps would cause the latter plane to lift into the air in a shorter distance, and the pilot's unfamiliarity with those flaps may have been a prime factor in causing the stall of the plane. No case is cited which specifically supports this contention. It is our view that, while that evidence might tend to explain the actions of Gargis on the occasion in question, it would not tend to establish any defense to plaintiff's claim and hence the court did not err in excluding it.

It is next contended that the court erred in permitting the plaintiff to testify, over the objection of defendant, for the reason that he was an incompetent witness under the provisions of Section 491.010 RSMo 1949, V.A.M.S., the so-called dead man's statute. Defendants, at the trial, took the position that plaintiff was incompetent for all purposes and made that general objection to the first several questions, which objections (except those relating to statements by deceased) were overruled. At that point the court disclosed its view that the testimony of plaintiff was admissible against the corporate defendant and, although inadmissible as against the defendant administrator, it could not be entirely excluded, and the court then instructed the jury not to consider the testimony as against the defendant administrator. We have concluded that the action of the court was correct.

While the statute under consideration is, under certain circumstances, applied in actions ex delicto it has not been as broadly applied in such cases as in actions ex contractu. The history of our statute and the

cases construing it were thoroughly reviewed in the case of Freeman v. Berberich, 332 Mo. 831, 60 S.W.2d 393. We think that case clearly supports the view that plaintiff was competent to testify against the corporate owner of the plane. In Freeman, the plaintiff sued the driver of the car in which she was riding and the owner of a truck which collided with it. The driver of the truck was dead at trial time. The owner of the truck objected (on the basis of the dead man's statute) to plaintiff's testimony because the truck driver (defendant's agent) was dead. In holding that the plaintiff was a competent witness the court stated, "It seems that a plaintiff, in an action for personal injuries, cannot be said to be disqualified under the statute from testifying concerning what an employee (of the defendant) who injured him said or did, by the death of the employee, without writing into the statute an additional disqualification which is not there. We therefore hold that plaintiff is not disqualified, in this case, from testifying * * *." Freeman v. Berberich, 332 Mo. 831, 60 S.W.2d 393, 402. Moreover, we do not think the fact that the administrator of the deceased pilot is a party herein would make any difference in our view. "The part of the statute relating to suits where an executor or administrator is a party seems to be specifically limited to contracts because it says the other party cannot testify, 'unless the contract in issue was originally made with a person who is living.'" Freeman v. Berberich, supra, 60 S.W.2d 393, 401.

■ The statute does not make a witness incompetent for all purposes. Findley v. Johnson, Mo.Sup., 142 S.W.2d 61. Furthermore, evidence admissible for one purpose or against either of two defendants should not be excluded because inadmissible for another purpose or against another defendant. Louis Steinbaum Real Estate Co. v. Maltz., Mo.Sup., 247 S.W.2d 652, 31 A.L. R.2d 1052; Brown v. Alton R. Co., 236 Mo. App. 26, 151 S.W.2d 727. In that situation the opposite party is entitled to an instruction, if he requests it, limiting the extent and purpose for which the jury may consider the evidence. Johnson v. Minihan, 355 Mo. 1208, 200 S.W.2d 334. In the case before us the trial court properly admitted the evidence and orally instructed the jury that it could not be considered as against the defendant administrator. No request was made for a written instruction. It should also be noted that the fact that this opinion holds that plaintiff failed to make a submissible case against the corporate defendant would have no effect upon the question of the admissibility of plaintiff's testimony at the trial. It was admissible at the time it was offered.

■ A vigorous attack is made on plaintiff's Instruction No. 2 which was the main instruction directing a verdict against the administrator defendant. It reads as follows: "The court instructs the jury that if you find and believe from the evidence that on September 19, 1953, that plaintiff, Gaylen Grimm, was a passenger at the invitation of George Gargis in an airplane being operated by George Gargis at Rosecrans Memorial Airport near St. Joseph, Missouri, if so, and that plaintiff at all times mentioned was exercising ordinary care for his own safety, if so, and if you further find and believe from the evidence that at said time and place, George Gargis initiated a take-off from Rosecrans Memorial Airport and flew said airplane in a nose-high attitude and failed to maintain sufficient air speed to remain air-borne, if so, and if you further find that in so failing to maintain sufficient air speed to remain air-borne (if you find he so failed) he failed to exercise ordinary care for the safety of Gaylen Grimm and was thereby negligent, if so, and that as a direct and proximate result of the negligence of George Gargis, if any, said airplane fell and crashed into the ground and that plaintiff as a direct result thereof was injured, if so, then your verdict must be in favor of plaintiff, Gaylen Grimm, and against defendant, John T. Gargis, administrator of the estate of George Gargis, deceased."

While defendant makes many specific complaints as to alleged essential elements

and facts omitted therefrom, we think his complaints may be substantially summarized in the one general statement that the instruction failed to hypothesize the essential facts upon which a verdict for plaintiff could be predicated. To support this contention he cites many cases, including Yates v. Manchester, 358 Mo. 894, 217 S.W.2d 541, and Dahlen v. Wright, 361 Mo. 524, 235 S.W.2d 366.

In considering this instruction it should be borne in mind that there was no real dispute as to what happened in connection with this take-off and resulting crash. There were a number of eyewitnesses and they were all essentially in agreement as to the acts and omissions of the pilot which brought about this unfortunate casualty. The expert witnesses agreed that the ultimate cause of the crash was the slow speed of the plane which caused it to stall. They also agreed that the dangerously slow speed resulted from the steep climb (nose-high attitude) of the heavily loaded plane (caused by having the flaps lever in the second and third notch) and the failure, after the stall warning sounded, to take the remedial step of lowering the nose of the aircraft, thus permitting it to regain a safe flying speed before continuing the climb. Defendant argues that all of the foregoing evidentiary facts (and others) were required to be hypothesized in the instruction. While such would likely have been proper we do not agree that the failure to do so, under the evidence herein, was error.

In a case such as this, where there is no real conflict in the factual theories relating to the circumstances surrounding the casualty, there is no necessity of a particularized hypothesization of all the evidentiary facts. Under the instant circumstances a submission of the ultimate facts which were essential to a finding for plaintiff was sufficient. Knight v. Richey, 363 Mo. 293, 250 S.W.2d 972.

We think this case presents one of the exact situations contemplated by the court in Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, 500, wherein it was said, "Where the evidence presents two or more divergent sets of essential facts, under one or more of which plaintiff would be entitled to recover and under one or more of which he would not, then a verdict-directing instruction or instructions given in his behalf should hypothesize, either by recital or by reference to other instructions, the facts essential in law to support the verdict. In like manner, verdict-directing instructions in behalf of the defendant should recite on their face or by reference to other instructions any essential fact or facts shown or not shown which will defeat plaintiff's right of recovery. Where there is no divergence in or denial of the essential facts, then the ultimate issue of the negligence pleaded and its being the proximate cause of the injury or damage alleged may be submitted by reference to the facts and circumstances shown by the evidence without specific hypothesization in the instructions. And, we may add, that if either of the parties deems a hypothesized fact or situation not to have been clearly or sufficiently hypothesized in any instruction, he should offer a clarifying or amplifying instruction." The fact that the petition in the case before us was based on the res ipsa loquitur theory would make no difference so long as the facts submitted conformed to the evidence.

The instruction under review hypothesized the ultimate essential facts that the pilot flew said plane in a nose-high attitude (climbing position) and "failed to maintain sufficient air speed to remain airborne." Since there was no real divergence in or denial of the essential facts, upon the authority of the Knight and Hooper cases, supra, we rule that the instruction contained a sufficient hypothesization to support a verdict for plaintiff. In this connection it should be noted that defendant did not offer any clarifying or amplifying instruction as suggested in the Hooper case.

 The final point briefed by defendant is that the verdict is excessive. "In

determining the issue of an excessive verdict, we do not weigh the evidence but consider only the evidence and inferences most favorable to the plaintiff and to the jury's verdict which has had the approval of the trial court." Pierce v. New York Central R. Co., Mo.Sup., 257 S.W.2d 84, 90.

█ Witnesses who saw plaintiff immediately after the crash described him as being in a dazed condition and that he could not walk; "he was a dirty bloody mess." He was taken to the hospital at once where he was examined and treated by Dr. J. M. Allman. This doctor testified that plaintiff had contusions and lacerations on the forehead, right elbow, and on the right leg; a fractured eleventh right rib, a sprain of the right shoulder, left wrist, and of the right ligamentous muscle; he was suffering from shock, had a cerebral concussion, and complained of dizziness, vertigo and diplopia (double vision). After spending four days in the hospital plaintiff was discharged as improved.

Dr. William Harris, an osteopath, stated that he treated plaintiff 35 or 40 times beginning in November 1953. Plaintiff complained of pain in the right shoulder and sacroiliac portion of back, headaches, and blurred vision. The difficulty in the shoulder was described as fibromyositis, a condition whereby the muscle tissue is interfered with by a fibrous infiltration. Dr. Harris sent plaintiff to Kansas City for X-rays and an eye examination. The witness examined plaintiff shortly before trial and stated that the shoulder had healed considerably, didn't "seem to bother him too much." When questioned about the permanency of these various conditions he stated that "in some degree these will probably be there for a long time. How permanent, I couldn't say." He testified further that he had been a friend of plaintiff for 12 years and that before the accident he was possessed of a pleasing disposition, but that since his injuries he will sometimes "blow up" and become irritable.

Dr. A. B. Crites testified that he examined plaintiff's eyes on November 11, 1953.

He found a swelling beneath the left eyeball and also found that the left eyeball occupied a position slightly anterior (one millimeter) to that of the right eye; that that condition is permanent and could have resulted from trauma or might have resulted from various other causes. There did not seem to be any marked disturbance in his vision.

An Osteopathic Radiologist, Dr. Scott testified that X-rays disclosed that the lumbo-sacral articulation spacing was narrower than is usually seen, which condition could have been caused by trauma or may have existed before the accident.

Dr. Jacob Kulowski, a physician specializing in orthopedics, stated that he examined plaintiff twice in April 1955. He found a sprain and limitation in motion of the low back, an inflammatory condition of one of the tendons of the right shoulder, and a roughened area at the point of the elbow. He prescribed a brace for plaintiff's back, and physical therapy. This doctor stated that in his opinion these "conditions could be permanent."

William Vendelboe testified that he had worked for plaintiff for seven years in his body repair shop and that before the accident plaintiff did any necessary heavy work, but since his injuries he "doesn't do lifting or swing the heavy mall." He stated further that before the accident plaintiff was cheery and friendly, but that now he is quick-tempered and grouchy.

Plaintiff's wife testified that she stayed with him the first night he was in the hospital and that he appeared to be in pain and was intermittently unconscious; that after going home he remained in bed for six weeks except for trips to the doctor's office; that his eye and elbow were swollen and he complained of pain in his shoulder and back. Except for brief appearances to "check," plaintiff did not go back to his work until January 1954. She further stated that before the accident plaintiff was in good health, and would bowl, play croquet and badminton, but has done none of those things since his injury; that before the ac-

cident he had a good disposition, but now he "isn't as good-natured and is very irritable with the children."

Plaintiff was 42 years old at the time of this casualty. No evidence was presented as to lost earnings or the amount of any medical expense.

"There is no precise method for determining the maximum award which the evidence in this case will support. Each case must be considered upon its own peculiar facts. Due regard should be given to the purchasing power of the dollar, to the rule of reasonable uniformity of awards for similar injuries and to the fact that the jury and the trial judge were in a better position than this court to measure an award of reasonable compensation, as well as to the fact that the trial court has approved the verdict in question." Burr v. Kansas City Public Service Co., Mo.Sup., 276 S.W.2d 120, 127.

In our discussion of the assignment under consideration no useful purpose would be served in summarizing and restating the foregoing evidence. However, we think it of primary significance that no evidence was presented from which the jury could have reasonably found that plaintiff suffered any substantial permanent injuries as a result of this accident. Dr. Harris said the conditions would be present in some degree for a long time, but "how permanent, I couldn't say." Another doctor said the conditions could be permanent. The testimony of these doctors fail to meet the requirement that "To recover damages for permanent injury the permanency of the injury must be shown with reasonable certainty and while absolute certainty is not required mere conjecture or likelihood, or even a probability, of such injury will not sustain the allowance of damages therefor." Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S.W.2d 328, 334. In this connection it should be stated that on redirect examination Dr. Harris testified that the fibromyositis in the shoulder "will result in permanency," but it should be noted that he also stated that upon his last examination that shoulder had heal-ed considerably and "didn't seem to bother him too much." The only other evidence of a permanent condition was as to the slightly anterior position of the left eyeball (with no marked disturbance of vision) which the doctor stated could have resulted from trauma or may have resulted from other causes. Moreover, although the jury could have considered the fact that plaintiff did not return to his work for three and one half months after he was injured, and that he was examined and treated by various doctors, it is nevertheless noteworthy that there was no proof of loss of earnings or of medical expenses.

We have concluded that the verdict herein is excessive and that the maximum amount for which a judgment should be permitted to stand is $7,500. While the facts differ in every case, we think our conclusion is supported by the following comparable cases: Baker v. Kansas City Terminal Ry. Co., Mo.Sup., 250 S.W.2d 999; McGarvey v. City of St. Louis, 358 Mo. 940, 218 S.W.2d 542; Harvey v. Gardner, 359 Mo. 730, 223 S.W.2d 428; Hamilton v. Patton Creamery Co., 359 Mo. 526, 222 S.W.2d 713.

The judgment against defendant Continental Exterminators, Inc. is reversed. If, within 15 days after the filing of this opinion, plaintiff will enter here a remittitur of $3,000 the judgment will stand affirmed in the sum of $7,500 as to defendant John Gargis, administrator of the estate of George Gargis, deceased, as of the date of the original judgment. Otherwise, the judgment will be reversed and the cause remanded for a new trial against said defendant.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

Opinion of HOLMAN, C., adopted, except as to remittitur, as to defendant John Gargis, Administrator of the Estate of George Gargis, deceased. Judgment as to him affirmed.

All concur.